THE LAW OFFICES OF

## NATHANIEL Z. MARMUR, PLLC

500 FIFTH AVENUE, 40TH FLOOR, NEW YORK, NY 10110
T: 212-257-4894   F: 646-829-9519
NMARMUR@MARMURLAW.COM
WWW.MARMURLAW.COM

January 14, 2021

The Honorable Victor Marrero
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:   United States v. Adrian Fiseku, 18 Cr. 767

Dear Judge Marrero:

This letter is written on behalf of Adrian Fiseku, who is scheduled to be sentenced by your Honor on January 22, 2021.

**A.   Introduction**

Adrian is 37-year-old year old man who stands before the Court for sentencing in connection with his plea of guilty to participating in a racketeering conspiracy underpinned by three commercial burglaries. His sentencing guidelines are 41-51 months. For compelling reasons, a sentence of home confinement is warranted. Chief among them is that, in 2018, following his offense conduct, he suffered devastating injuries while working at a construction site, injuries so severe that they guarantee him a lifetime of pain, grueling physical therapy, and untold surgeries. Among other things, his left elbow was shattered into fragments, he broke his forearm and leg, his left hip was shattered, and he broke all of his pubic rami, which are the bones that hold his hips together when he stands up. He has already undergone multiple surgeries involving the placement of pins, plates and screws, and there are many more on the horizon. He is, by any fair measure, a physically broken young man.

**B.   Family History and Personal Background**

Adrian was born in 1983 and grew up in Staten Island, the youngest of three children. Life was hard – "tough and lonely," as he describes it. PSR ¶95. Adrian's brother, Bekim, tells how their father was an absent alcoholic. Letter of Bekim Fiseku ("Our father was never there for us, he would be gone for months at a time and when he did come home he would always be drunk and be gone within a few days.").[1] On many occasions the family would look for their missing father "at all the bars, after hours and social clubs." Id. On the few occasions he was at home "he would physically abuse our mother in front of us." Id. The burden of

---

[1]   Letters from family and friends are attached as Exhibit 1.

earning money and raising the family thus fell on Adrian's mother, who worked nights as a cleaning woman in New York commercial buildings. See letter of Violeta Daci (Adrian's sister); letter of Bekim Fiseku ("Our mom worked 6 days a week from 3pm to 12am . . . . [she] was always working.").

Life became even harder when Adrian's father died when Adrian was just eight. Adrian recalls that he was told it was from a brain tumor, PSR ¶92, but his brother says that he died of AIDS, see letter of Bekim Fiseku ("he withered away to 100 pounds"). Rather than pick up the mantle of a father figure, Bekim "started doing drugs and disappearing also." Id. It was the beginning of a life of crime that removed him from Adrian's life. With no father, an absent brother, and a mother working afternoons and evenings to support the family, Adrian was left to his own devices. He turned to high-risk behavior, like jumping out his window and breaking his leg shortly after his father died. See letter of Violeta Daci; letter of Bekim Fiseku. Over the years he suffered an unusual number of injuries: he was seriously injured in two motorcycle accidents and a car accident, and was beaten with a baseball bat by a friend's father. See letter of Violeta Daci; PSR ¶99. He began to use drugs on a daily basis and compulsively gambled. See PSR ¶¶ 43. 108, 110.

Despite these troubles, Adrian persevered. He was always employed, lived at home and helped to support his mother. See letter of Violeta Daci ("Adrian has been working since he was 17 years old and would always give our mother money from his check to help her."); PSR ¶98 (sister corroborating that Adrian "was always working prior to his [2018] accident"); PSR ¶¶ 121-127 (employment history). His mother explains:

> Since the age of 17, my son Adrian always worked, and always gave me money to help with bills and food. Adrian has had many different jobs but always worked. My son worked around the house with fixing things and helped me personally. I had a knee replacement surgery done a few years ago and I could not walk around for weeks and my son was always there for me. My son would push me to do exercise and would massage my knee every day to help with the pain and get me back on my feet to move around. . . . .

Letter of Kujtime Fiseku.

Most of Adrian's employment was in construction, where he was a valued co-worker. For example, Adrian would always look out for others' safety. See letter of Durim Dika (when they were "roofing" together, Adrian "went [down] before me and pretty much made sure I didn't fall"). And he has built solid friendships,. See letter of Parim Murati ("he is a good, compassionate person, the norm for him was to put others first"); letter of Durim Dika ("He would help a total stranger.").

Ali Sadiku is especially close to Adrian, both having lost their fathers at a young age. He says that "Adrian really isn't just a friend of mine, he is the older brother I never had."

And that "He is the most respectful person I have ever met, literally one of the nicest people in my life!" And he predicts that Adrian "will prevail and succeed in life after this is all over."

Adrian is so reliable that Linda Maqellara, who works at a preschool for children with special needs, made him the godfather to her own three children. She describes him as "an honest, loving and peaceful person," a "dependable" and "respectful" "hardworking man." See also letter of cousin Lucille Bilali, a teacher for the Department of Education (describing Adrian as "kind and a gentleman"); letter of cousin Sazan Greva ("[g]rowing up he was always kind hearted and helped out anyone that needed him"); letter of Florind Popovic ("Adrian is a good man with a good soul he is loved and a true leader to the community where I am from.").

The Probation Department recognizes these factors in recommending a downward variance. See PSR at 32 (citing, among other things, Adrian's difficult childhood, his "substantial work history," his compliance with the terms of his pretrial release and his lack of a "significant prior criminal history," all of which "may be indicative of an individual with the ability to lead a law-abiding life").

C. **Adrian's 2018 Work-Related Injury**

On August 8, 2018, Adrian suffered devastating injuries while working as a roofer when he fell 20 feet through an unguarded hole, landing on his left side. An operative report prepared the day after the fall provides the initial, extraordinary trauma to Adrian's body. Exhibit 2. Pictures of Adrian immediately after the fall are attached as Exhibit 3.

As a subsequent Narrative Medical Report details, Adrian "sustained fractures to his left elbow, left wrist, right and left pelvis, left hip and right hand." Exhibit 4, at 1. He was rushed to the emergency room and hospitalized for seven days, where he underwent multiple surgeries, including the placement of rods and screws in his left femur. Id. at 3. He was then admitted to the acute rehabilitation ward for thirteen days, before being discharged for home care services. Id. at 1. Upon his release, his mother, sister and friends carried him, bathed him, dressed him and changed his bedpans. After months of painful rehabilitation, he was able to ambulate again, but he was hobbled by the severity of his fractures. The past two plus years have been nothing short of a disastrous string of doctor's visits, tests and grim prognoses.

Among other things, he has endured scores of painful physical and occupational therapy sessions, and he sees numerous doctors on a regular basis. He has continued to suffer debilitating pain which interrupts his sleep and is a constant – and permanent – reminder of his accident. He has limited range of motion in his left wrist and elbow, as well as his spine. His ability to walk has been affected. Over time his pain has actually increased. See id. at 2 (in follow-up evaluations in mid-2019, "[h]is left hip pain and lower back pain [were] more prominent").

The Report summarizes his injuries as follows:

> At this time, this patient suffers from significant and
> chronic pain in his lower back and left hip that radiates into his left

3

> thigh and groin [and] is associated with limited range of motion in his lumbosacral spine and left hip associated with an abnormal gait. He also suffers from chronic and significant pain in his left elbow and wrist associated with weakness and limited range of motion . . . .
>
> Since [his injury] . . . he has undergone surgical intervention to his left hip and left elbow followed by extensive conservative treatment including courses of inpatient physical and occupational therapy in an acute rehab setting followed by home therapy and then outpatient therapy as well as pharmacological therapy including non-steroidal anti-inflammatories, opioid analgesics and anti-epileptics.
>
> Despite all of these interventions, he continues to experience significant pain and resulting functional limitation. <u>At this time, his condition has become chronic and permanent.</u>
>
> In review of the patient's medical records, medical history, and examination on 1/30/20, I find to a reasonable degree of medical certainty, that patient has sustained permanent injury and significant loss of use of his lumbosacral spine, left hip, left elbow and left wrist and I find the patient's injuries to have caused loss of range of motion and loss of use of his lumbar spine, left hip, left wrist and left elbow.

Id. at 6 (emphasis added).[2]

---

[2] In more technical terms, he suffered the following injuries: displaced comminuted intertrochanteric fracture of the left femur with varus angulation and adjacent overlying hematoma; fracture of the left superior and inferior pubic rami; right sacral fracture; left comminuted intra-articular distal radial fracture extending into the lunate facet; comminuted fracture of the anterior aspect of the left radial head with osseous defect; impaction fracture deformity of the left posterior capitellum and the posterior trochlea; comminuted fracture at the base of the left coronoid process of the ulna with anterior displacement of the fracture fragments; comminuted chip fracture of the anterior aspect of the left radial head; fracture dislocation of the left elbow with several displaced fracture fragments projected over the capitellum and complete dislocation of the radicapitellar and ulnohumeral joints; left hip fracture; closed reduction internal fixation of left hip fracture; irrigation and debridement of upper extremity surgery under general anesthesia; displaced transverse fracture through the right fourth distal phalanx with cortical width dorsal displacement; displaced fracture of the left seventh rib hypertrophic surgical scarring; oblique fracture patterns; hardening of skin around fracture sites; skin sensitivity around fracture and incision sites; and left leg shortening.

4

A December 18, 2020 report provides a sobering update to Adrian's condition. The report details a series of surgeries he still needs, such as ones to his left elbow (including a possible elbow replacement); to his left hip (including a possible hip replacement); to his left wrist (including a possible wrist replacement); to his right ring finger; and to his lumbar spine. Exhibit 5 at 8-9. Moreover, Adrian will require ongoing physical therapy, the use of prescription and over-the-counter medications, radiologic studies, and innumerable medical consultations. Id. at 9. The report explains that "[h]is condition interferes with his quality of life, his activities of daily living and his ability to work full-time as a laborer. He has been unable to return to work as a result of his injuries." Id. (He receives worker's compensation, see PSR ¶121, and he has a pending lawsuit related to the injuries.) Not surprisingly, the report concludes that Adrian's "prognosis is poor." Exhibit 5 at 8.

In sum, Adrian will experience a lifetime of pain, surgeries, and severe limitations on his ability to ambulate.

D. **The Offense Conduct**

Adrian has admitted to a racketeering conspiracy predicated on his participation in three burglaries of commercial jewelry establishments. Adrian has also admitted his participation in the interstate transportation of jewels in order to sell them. The burglaries took place during off hours and there were no victims present at the time, nor weapons carried. His allocution was fulsome and his plea timely. He feels deeply remorseful because he recognizes that his actions caused real harm to the victims.

Although Adrian makes absolutely no excuses for his conduct, it is important to recognize that these crimes were committed to fuel of a crippling gambling addiction. He candidly reported in his presentence interview that he "would gamble on slot machines, cards, and sports," often wagering thousands of dollars at a time. PSR ¶108. Though he was always employed, what he earned was never enough to fuel his need to wager. See id. ("if [he] had it, [he] would bet it"). The PSR demonstrates just how compulsive Adrian's behavior was. For example, it describes his gambling shortly after the group fenced the jewels from the December 31, 2016 burglary of a jewelry store in Manhattan, the fruits of which were later sold in Los Angeles. See PSR ¶ 39, et seq. It describes how he booked a series of hotel rooms in Las Vegas in early 2017, and then returned to Vegas in May of that year. Among other things, gambling records show significant wagers: a $5,700 bet on May 24; $76,000 in sports betting between May 10 and May 25; and cash in/cash out at the gaming tables in amounts ranging from $10,457 to $21,922. The PSR states, however, that Adrian has reportedly not gambled since 2018. See PSR ¶108.

5

THE LAW OFFICES OF
NATHANIEL Z. MARMUR, PLLC

**E.      The Sentencing Guidelines**

The parties and the Probation Department agree that Adrian's base offense level is 22, that he has no criminal history points, and that the resulting advisory guidelines range is 41-51 months. The Probation Department recommends a downward variance to 36 months.

**F.      A Sentence of Home Confinement is Warranted**

Adrian Fiseku is a kind and well-liked young man. But he is also the product of a tough childhood, a family unmoored by a father figure. Even worse, he was raised under the shadow of a big brother whose life has been devoted to crime. Despite those obstacles, Adrian has dedicated his life to hard work – he has always been employed and supports his mother financially, emotionally and physically. A strong compulsion to gamble, however, drove him to seek extra funds through criminal activity. And what he received from his heists, he just as quickly blew at the casinos.

Adrian's criminal behavior is not likely to recur. See PSR at 32 (Adrian has "the ability to lead a law-abiding life"). This is the first time Adrian has been in serious criminal trouble, and he has proven over the last two years that he can be better. He has abided by all the terms of his pre-trial release, including being fully compliant with the significant restrictions imposed by home confinement during the majority of that time. Moreover, Adrian reports that "he has not gambled since 2018." PSR ¶108. Rather, Adrian has spent his time engaged in rigorous physical rehabilitation to repair his broken body and to alleviate the excruciating pain that he lives with every day. It is notable that he has done all this while remaining drug-free, see PSR ¶116 ("all drug tests have returned negative for illicit substances"), despite a life of frequent and, at times, daily drug use, see PSR ¶¶109-114.

It is also relevant that the guidelines here are driven largely by the loss amount involved in the offenses. It has been observed that "[t]he Guidelines place undue weight on the amount of loss." United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004). That sentiment is particularly true where, as here, the defendant's share of the illicit proceeds is relatively small. See United States v. Qualls, 25 F. Supp. 3d 248, 260 (E.D.N.Y. 2014)(noting downward variance in United States v. Collins, No. 07 cr. 1170 (LAP) (S.D.N.Y. July 15, 2013), in part because the defendant there "benefitted little" from the overall scheme). Adrian realized only a small amount of personal gain from the thefts – the jewels were fenced for a small percentage of their retail value, and even then Adrian received only a portion of those proceeds, which were divided up amongst the defendants.

Most importantly, however, a downward variance is warranted because of the incredible burden that incarceration would impose on Adrian given his injuries. The damage to his body cannot be overstated – he is, physically, a shell of his former self. The confluence of severe fractures makes full recovery impossible. Regardless of medical care, he will live a life fraught with pain and limitations of mobility, all of which will make incarceration extraordinarily more difficult than for the average defendant. And it is almost certain that Adrian will not receive in prison the medical care prescribed by his doctors, including the multiple surgeries to repair his broken body. Furthermore, his immune system is weakened because of a blood

transfusion he received a few days after his accident, making him more susceptible in prison to COVID and serious complications should he contract it. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited December 29, 2020)(immunocompromised individuals might be at an increased risk for severe illness stemming from COVID-19).[3] Adrian is also highly unlikely to recidivate because his life-altering injuries prohibit the very kind of conduct that landed him before the Court. In sum, a substantial downward variance is warranted because the burden of incarceration is higher, the need for incapacitation is lessened, and the treatment required cannot be obtained in prison. As the Guidelines recognize in the context of departures, "[a]n extraordinary physical impairment" may warrant a departure to home detention "if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the cases from the typical case covered by the guidelines." USSG §5H1.4; see United States v. Jimenez, 212 F. Supp. 2d 214, 216 (S.D.N.Y. 2002) (granting departure where defendant suffered "grievous physical injury" after committing crime). Such is the case here.[4]

---

[3] Likewise, he is a two-pack a day smoker, another high-risk factor for COVD. See id. (listing smoking as one of eleven conditions that place one "at increased risk of severe illness from the virus that causes COVID-19").

[4] We cite this authority only by analogy as we are not seeking a departure, but a variance based on Adrian's physical condition.

THE LAW OFFICES OF
NATHANIEL Z. MARMUR, PLLC

**G.     Conclusion**

Adrian Fiseku committed these offenses to help fuel a gambling habit that he has worked hard to overcome.  He has otherwise led a crime-free life, working productively and helping to support his mother physically and financially.  He timely accepted responsibility for his conduct, and has been fully compliant with the terms of release for over two years.  During that time he has worked tirelessly to repair his broken body, one that that causes him intense pain that is not expected to subside.  Incarceration will be extraordinarily difficult given his injuries, and almost certainly will not provide the frequent care or the multiple surgeries still required.  As such, we respectfully request that the Court grant a substantial downward variance from the stipulated guidelines range and impose a sentence of home confinement.  His body, after all, is a prison unto itself.

Respectfully,

/s/ Nathaniel Z. Marmur

Nathaniel Z. Marmur

cc:    AUSAs Margaret Graham and Andrew Chan (by ECF)