

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 14, 2021

**BY CM/ECF**

The Honorable Victor Marrero
United States District Judge
Southern District of New York
Daniel Patrick Moyniham U.S. Courthouse
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Adrian Fiseku*, **18 Cr. 767 (VM)**

Dear Judge Marrero:

    The defendant in the above-captioned case is scheduled to be sentenced on January 22, 2021 at 11:00 a.m. For the reasons set forth below, the Government believes that a sentence within the stipulated Guidelines range of 41 to 51 months' imprisonment would be sufficient, but not greater than necessary, to meet the purposes of sentencing.

    **I. Offense Conduct**

    As described in the Presentence Investigation Report ("PSR"), since at least in or around 2006, the Federal Bureau of Investigation ("FBI") and the New York City Police Department ("NYPD") have been investigating an international burglary crew led by co-defendant Damir Pejcinovic (the "Pejcinovic Enterprise"). Pejcinovic was the leader of the burglary crew and typically chose the burglary locations, the members of the burglary who would participate in each burglary, what tools to bring, and how to dispose of the stolen merchandise if the burglary was successful. During the burglaries, Pejcinovic usually played the role of lookout and did not go inside any of the locations. (PSR ¶ 12). Following the burglaries, the burglary crew frequently transported the stolen property across state lines and international borders to be sold to fences. During the course of the investigation, the FBI and NYPD identified at least 16 burglaries and attempted burglaries that were committed by the Pejcinovic Enterprise between in or around 2006 and in or around April 2017, which were committed in locations all across the United States and Europe, including in New York City. In addition to Pejcinovic, there was a rotating cast of other members of the crew who were involved in some but not all of the burglaries. These other individuals included: the defendant, Gzimi Bojkovic, and Elvis Cirikovic. (PSR ¶ 13).

    The FBI and NYPD identified at least 3 burglaries and attempted burglaries between 2011 and 2017 in which the defendant participated with other members of the Pejcinovic Enterprise: (1)

a burglary of a jewelry store in Los Angeles on or about February 19, 2011 (the "February 2011 Burglary"); (2) the burglary of a jewelry store in Manhattan on or about December 31, 2016 (the "December 2016 Burglary"); and (3) the burglary of a jewelry store in Los Angeles on or about March 20, 2017 (the "March 2017 Burglary"). These burglaries are further described below.

### The February 2011 Burglary

In or around February 2011, the defendant traveled with co-defendants Pejcinovic, Bojkovic, and two others to Los Angeles to canvass several possible jewelry stores for heists. Eventually, Pejcinovic decided that the crew would try to execute a burglary at a jewelry store in Downtown Los Angeles. Because the jewelry store was next to a vacant store at the time, the defendant, Bojkovic, and another individual first broke into the vacant store through a fire escape and then used sledge hammers to break down a sheetrock wall that was directly between the vacant store and the jewelry store. The crew then smashed the display cases in the store and took all the jewelry. While this was happening, Pejcinovic and another individual were serving as lookouts outside the store. Following the heist, Pejcinovic rented a house in the Los Angeles area, where the burglary crew bagged up the jewelry and transported the jewelry in a rental car back to New York City. (PSR ¶ 28).

On or about February 19, 2011, law enforcement officers from the Los Angeles Police Department responded to reports of a burglary at a jewelry store located in Los Angeles. Law enforcement officers observed that the building next to the jewelry store had been broken into, and a wall was broken down to get into the jewelry store. Law enforcement officers also recovered a black backpack and several screwdrivers that were left behind near the scene of the burglary. Surveillance video from the store shows approximately three individuals inside of the jewelry store wearing masks, gloves, and carrying backpacks. A large quantity of jewelry valued at over $3 million was stolen during the burglary. (PSR ¶ 29).

### The December 2016 Burglary

On December 31, 2016, the defendant, Pejcinovic, Bojkovic, and another individual committed a burglary of a jewelry store in Manhattan. Prior to the burglary, Pejcinovic obtained information about the pin numbers for safes inside of the jewelry store from a safe salesman. The next night, the defendant, Pejcinovic, Bokovic, and another member of the burglary crew drove to the location of the jewelry store to conduct reconnaissance. The following day, the defendant, Bojkovic, and another member of the burglary crew entered the building where the jewelry store was located through a building next door that was being renovated and then broke through a wall to get into the building. The pin numbers that Pejcinovic had obtained worked, and the burglary crew stole the jewelry from the safes. (PSR ¶ 39).

The crew then drove the defendant's car to Pejcinovic's apartment in the West Village to divide up the jewelry. Several days later, the Bojkovic, Pejcinovic, and another individual went to a jeweler in the Diamond District in Manhattan to get an estimate for how much money the stolen jewelry was worth. The jeweler offered $300,000-$400,000, which the crew felt was too low. Pejcinovic suggested that the crew go to Los Angeles to look for a buyer for the merchandise. Two days later, Pejcinovic arranged for another member of the crew to book a ticket on Amtrak

to California and was further instructed to keep an eye out for the level of security during the cross-country trip. Pejcinovic and the defendant separately traveled to California. Bojkovic then traveled by train with the stolen jewelry to California. Over the next several weeks, the burglary crew slowly sold some of the pieces of jewelry in Los Angeles. A representative from the jewelry store in Manhattan estimated that the losses were approximately $3.6 million. (PSR ¶ 40).

### The March 2017 Burglary

While in Los Angeles, the defendant participated in another burglary with Pejcinovic, Bojkovic, and another member of the burglary crew. On March 20, 2017, the defendant, Bojkovic, and another member of the crew broke into the jewelry store while Pejcinovic served as a lookout. The defendant began drilling into the safe, during which another member of the crew noticed that the safe code was sitting in a rolodex, and the safe opened. Before the team left with the jewelry, the defendant started a fire inside the store. (PSR ¶ 44).

Law enforcement officers and fire department officials from the Los Angeles Police Department and Los Angeles Fire Department reported to the jewelry store after a fire alarm was triggered. Firefighters who arrived on the scene saw that the front door could not be opened, so they went through a neighboring door and through the fire escape, where they observed that a window to the jewelry store was open, with the security bars missing. They then entered the jewelry store and observed that the front door was barricaded, the room was ransacked, and there was an incendiary fire near the window that had been put out by the building's sprinkler system. They also observed a large safe that had a hole drilled on the side of it. Firefighters noticed that the contents of the safe had been emptied. A representative of the jewelry store estimated that the value of the precious stones that were taken is approximately $2 million. (PSR ¶ 45).

On October 22, 2018, an indictment was filed charging the defendant with participating in a racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d) (Count One); and conspiracy to commit interstate transportation of stolen property, in violation of Title 18, United States Code, Section 371 (Count Two). A superseding indictment was filed on October 26, 2018 correcting certain typographical errors in the original indictment. The defendant was arrested on October 24, 2018. (PSR ¶¶ 1-5).

### II. The Defendant's Plea and Applicable Guidelines Range

On March 13, 2020, the defendant pleaded guilty to participating in a racketeering conspiracy pursuant to a plea agreement. (PSR ¶ 6). Pursuant to U.S.S.G. § 2E1.1, the plea agreement stipulated that the base offense level is the greater of 19 or the offense level applicable to the underlying racketeering activity, which is the commission of burglaries and subsequent interstate transportation and sale of stolen property. Pursuant to U.S.S.G. § 2E1.1 n.1, each underlying offense is treated as if contained in a separate count of conviction. Pursuant to U.S.S.G. § 2E1.1 n.2, the burglaries, which violate state law, are considered under the most analogous federal offense. Pursuant to U.S.S.G. § 3D1.2(d), the burglaries are not grouped together, as they are offenses covered by U.S.S.G. § 2B1.2, and are therefore specifically excluded from grouping.

Case 1:18-cr-00767-VM   Document 188   Filed 01/14/21   Page 4 of 6

Page 4

Pursuant to U.S.S.G. § 3D1.3(a), the plea agreement stipulated that the base offense level for the burglary and interstate transportation and sale of stolen property on or about February 19, 2011 (the "February 2011 Burglary") was 22, based on the higher offense level for the interstate transportation and sale of stolen property. Pursuant to U.S.S.G. § 2B2.1(a)(2), the plea agreement stipulated that the base offense level for the burglary is 12. Pursuant to U.S.S.G. § 2B2.1(b)(1), the plea agreement stipulated that two offense levels are added because the offense involved more than minimal planning. Pursuant to U.S.S.G. § 2B2.1(b)(2)(G), the plea agreement stipulated that six offense levels are added, because the loss was more than $3 million but less than $5 million. Accordingly the resulting offense level for the burglary is 20. Pursuant to U.S.S.G. § 2B1.1(b)(1)(I), the plea agreement stipulated that 16 offense levels are added because the loss was more than $1.5 million but less than $3.5 million. Accordingly, the resulting offense level for the interstate transportation and sale of stolen property was 22.

Pursuant to U.S.S.G. § 3D1.3(a), the plea agreement stipulated that the offense level for the burglary and interstate transportation and sale of stolen property on or about December 31, 2016 (the "December 2016 Burglary") is 22, based on the higher offense level for the interstate transportation and sale of stolen property. Pursuant to U.S.S.G. § 2B2.1(a)(2), the plea agreement stipulated that the base offense level for the burglary is 12. Pursuant to U.S.S.G. § 2B2.1(b)(1), the plea agreement stipulated that two offense levels are added because the offense involved more than minimal planning. Pursuant to U.S.S.G. § 2B2.1(b)(2)(G), the plea agreement stipulated that six offense levels are added, because the loss was more than $3 million but less than $5 million. Accordingly, the resulting offense level for the burglary is 20. Pursuant to U.S.S.G. § 2B1.1, the plea agreement stipulated that the base offense level for the interstate transportation and sale of stolen property was 6. Pursuant to U.S.S.G. § 2B1.1(b)(1)(I), the plea agreement stipulated that 16 offense levels are added, because the loss was more than $1.5 million but less than $3.5 million. Accordingly, the resulting offense level for the interstate transportation and sale of stolen property was 22.

Pursuant to U.S.S.G. § 2B2.1(a)(2), the plea agreement stipulated that the base offense level for the March 2017 Burglary was 12. Pursuant to U.S.S.G. § 2B2.1(b)(1), the plea agreement stipulated that two offense levels are added because the offense involved more than minimal planning. Pursuant to U.S.S.G. § 2B2.1(b)(2)(F), the plea agreement stipulated that five offense levels are added, because the loss was more than $1.5 million but less than $3 million. Accordingly, the resulting offense level for the March 2017 Burglary was 19.

Pursuant to U.S.S.G. § 3D1.4(a), the February 2011 Burglary, which has the highest offense level, is counted as one Unit. The December 2016 Burglary is equally serious and is counted as an additional Unit. Pursuant to U.S.S.G. § 3D1.4(b), the March 2017 Burglary is counted as an additional Unit because it is 1 to 4 levels less serious than the February 2011 Burglary. Pursuant to U.S.S.G. § 3D1.4, because the resulting number of Units is three, three offense levels are added to the offense level otherwise applicable to the December 2016 Burglary, which is 22. Accordingly, the resulting offense level is 25. Assuming a three-level reduction due to the defendant's acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, the plea agreement stipulated a total offense level of 22. The plea agreement also stipulated that the defendant had zero criminal history points, resulting in a Criminal History Category of I. As a result, the plea agreement stipulated that the Guidelines range was 41 to 51 months' imprisonment.

In the PSR, prepared on June 2, 2020 (Docket No. 137), the Probation Office also found that the Guidelines range was 41 to 51 months' imprisonment. (PSR ¶¶ 55-86, 134).

### III. Discussion

#### A. Applicable Law

Although *United States* v. *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)  to afford adequate deterrence to criminal conduct;
> (C)  to protect the public from further crimes of the defendant; and
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### B. A Sentence Within the Guidelines Range is Reasonable in this Case.

The Government submits that a sentence within the Guidelines range of 41 to 51 months' imprisonment is sufficient in this case to reflect the seriousness of the defendant's conduct, promote respect for the law, and provide just punishment for the offense.

At the outset, a substantial term of incarceration is necessary to reflect the seriousness of the defendant's conduct and promote respect for the law. For years, the defendant participated in a burglary crew that committed sophisticated heists of jewelry stores and banks located all across the United States and in Europe. The crew carefully researched potential locations to hit, conducted reconnaissance to look for structural vulnerabilities in the target locations, disrupted the

operation of security systems and alarms, and used power tools, saws, sledge hammers, and spray foam to break into stores, safes, and display cases. The burglary crew's actions resulted in extensive destruction and property damage to the commercial establishments that were targeted. In many instances, the burglary crew then transported the stolen proceeds across state lines to a variety of fences located across the country to avoid law enforcement detection. Each of these actions was the result of careful planning and premeditation—designed to minimize the risk of law enforcement detection, with no regard for the financial losses that the burglary crew was causing to its victims. It is no coincidence that the FBI and the NYPD investigated this sophisticated burglary crew for over a decade before finally bringing charges in 2018.

The Government recognizes that the defendant has a minimal criminal history and was not as culpable as co-defendant Damir Pejcinovic—who served as the leader of the enterprise. But the defendant was nevertheless a key member of this sophisticated burglary crew for years, participating in at least three burglaries in New York City and Los Angeles. During these burglaries, the defendant played a variety of roles, including climbing into buildings, breaking down sheetrock walls, destroying display cases, infiltrating safes, and transporting the stolen property to fences located across the country. During the March 2017 Burglary, the defendant also committed an arson inside the jewelry store before fleeing the scene. (PSR ¶ 44). In total, the burglary crew caused over $10 million in losses to victims, many of whom were small independently-operated businesses that absorbed the losses caused by the burglary crew. Based on the defendant's financial status, he will likely never fully satisfy his restitution obligations. Because of the seriousness of this offense, the length of time that the defendant participated in this offense, and the harm that the defendant caused in the community as a result of this offense, the Government respectfully submits that a sentence within the Guidelines range is necessary here under 18 U.S.C. § 3553(a).

**V.    Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Guidelines range of 41 to 51 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By:     /s/ Andrew K. Chan
Andrew K. Chan
Margaret Graham
Jamie Bagliebter
Assistant United States Attorneys
(212) 637-1072 / 2923 / 2236

cc: Nathaniel Marmur, Esq.